UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| ADAM HOLBROOK, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 6: 17-244-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| MAZDA MOTOR CORP., et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

This action arises out of an automobile accident in Harlan County, Kentucky, in which a 2006 Mazda5 collided head-on with a rock wall. [Record No. 1-1, ¶ 18] The driver of the vehicle, Adam Holbrook, was severely injured in the accident. The right front seat passenger, Joshua Holbrook, sustained fatal injuries. [*Id.* ¶¶ 21, 22] Adam Holbrook and the administrator of Joshua Holbrook's estate brought this products liability action against multiple Mazda entities and various corporations involved in the design and manufacture of the Mazda5's restraint system and airbags. Defendants Ashimori Industry Company, Ltd., Daciel Corporation, Daciel Safety Systems, Inc., and Mazda Motor Corp., have moved to dismiss the claims against them for lack of personal jurisdiction. [Record Nos. 25, 26, 27] The motions will be granted for the reasons that follow.

## I.

The automobile at issue was designed, tested, and manufactured by Defendant Mazda Motor Corporation ("MMC"), a Japanese company headquartered in Japan. [Record No. 26-2, ¶ 4] Defendants Daciel Corporation ("DC"), Daciel Safety Systems, Inc. ("DSS"), and

Ashimori Industry Company, Ltd. ("Ashimori") designed and manufactured components of the vehicle's airbag and restraint systems. [*Id.* ¶ 5; Record No. 25-2, ¶ 9; Record No. 27-2, ¶ 6; Record No. 27-3, ¶ 6]

DC is a Japanese corporation with its principal place of business in Japan. It designs airbag inflators and other pyrotechnic devices. [Record No. 27-3, ¶ 4] The airbag inflators and their parts are manufactured by DSS, which is also a Japanese corporation with its principal place of business in Japan. [Record No. 27-2, ¶ 3] After the airbag inflators are manufactured, DC buys them from DSS and sells them to third party manufacturers. [*Id.* ¶ 4] The third party manufacturers then incorporate the airbag inflators into airbag modules, which are eventually sold to automobile manufacturers for inclusion in their vehicles.[1] [*Id.*]

An inspection revealed that the airbag inflators in the Mazda5's driver and passenger side airbag modules were manufactured by DSS and sold to DC. [Record No. 27-3, ¶ 6] DC then sold them to Ashimori, a Japanese company headquartered in Japan, which manufactured the airbag module and seat belt assemblies for the Mazda5. [Record No. 25-2, ¶¶ 4, 9-10] Ashimori sold the airbag module and seat belt assemblies to MMC and delivered them to MMC in Japan, where they were installed on the Mazda5. [Record No. 26-2, ¶ 4]

After completing the manufacture and testing of the Mazda5, MMC sold it to Defendant Mazda Motor of America, Inc., d/b/a Mazda North American Operations ("MNAO"), in Japan. At that point, "MMC had no control over the subject vehicle, including where the subject

---

[1] DC has a subsidiary named Daciel America Holdings, Inc. which, in turn, has a subsidiary named Daciel Safety Systems America Holdings, Inc. ("DSSA"). [Record No. 27-4, ¶ 4] DSSA is a Kentucky limited liability company that manufactures airbag components and distributes them in the United States. [*Id.* ¶¶ 17-19] DSSA is a defendant in this action but has not moved to dismiss for lack of personal jurisdiction.

vehicle was ultimately shipped, distributed, or sold to consumer." [*Id.* ¶ 5] MNAO, a California corporation doing business in Kentucky, subsequently sold the vehicle to an independently owned and operated automobile dealer. [*Id.*; Record No. 1-1, ¶ 5] Bill Martin, the administrator of Joshua Holbrook's estate, eventually purchased the vehicle at the Alton Blakely dealership in Somerset, Kentucky. [Record No. 30, p. 6]

The vehicle later collided head-on with a rock incline wall, resulting in severe injuries to Adam Holbrook and the death of Joshua Holbrook. [Record No. 1-1, ¶¶ 18, 21-22] The plaintiffs claim that these injuries "occurred because the vehicle and its components were not reasonably crashworthy, and were not reasonably fit for unintended, but clearly foreseeable, accidents or collisions." [*Id.* ¶ 33] They assert strict liability, negligence, and breach of implied warranty claims against six defendants. [*Id.* ¶¶ 38-108] Four of the defendants—MMC, Ashimori, DSS, and DC—have moved to dismiss the claims against them for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). [Record Nos. 25, 26, 27]

## II.

"The plaintiff bears the burden of establishing that jurisdiction exists." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). Where, as here, the parties have not conducted jurisdictional discovery and the Court has not held an evidentiary hearing, "the plaintiff must make only a *prima facie* showing that personal jurisdiction exists in order to defeat dismissal." *Id.* In this procedural posture, "the pleadings and affidavits . . . are received in a light most favorable to the plaintiff," and the Court "does not weigh the controverting assertions of the party seeking dismissal." *Id.* at 1459. However, "the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Id.* at 1458. The amount of evidence necessary to avoid dismissal for lack of

personal jurisdiction is similar to that required to avoid summary judgment. *Id.* at 1458-59; *see also Weller v. Cromwell Oil Co.*, 504 F.2d 927, 929-30 (6th Cir. 1974).

The plaintiff's *prima facie* case must establish that: "(1) jurisdiction is proper under a long-arm statute or other jurisdictional rule of . . . the forum state; and (2) the Due Process Clause also allows for jurisdiction under the facts of the case." *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012). If either part of this test is not met, the analysis ends, and the Court may not exercise personal jurisdiction over the defendant. *Id.* at 711-12.

### III.

Kentucky's long-arm statute lists nine specific circumstances under which a nonresident defendant may be subject to personal jurisdiction in Kentucky. Ky. Rev. Stat. § 454.210(2). This Court may only exercise personal jurisdiction over a nonresident defendant "if the cause of action arises from conduct or activity of the defendant that fits into one of the statute's enumerated categories." *Caesars Riverboat Casino, LLC v. Beach*, 336 S.W.3d 51, 57 (Ky. 2011). A claim "arises from" certain conduct when there is a "reasonable and direct nexus" between the conduct causing injury and the defendant's activities in the state. *Id.* at 59.

The categories relevant to this action are as follows:

(2)(a) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a claim arising from the person's:

. . . .

2. Contracting to supply services or goods in this Commonwealth;

3. Causing tortious injury by an act or omission in this Commonwealth;

4. Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any

other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth, provided that the tortious injury occurring in this Commonwealth arises out of the doing or soliciting of business or a persistent course of conduct or derivation of substantial revenue within the Commonwealth;

5. Causing injury in this Commonwealth to any person by breach of warranty expressly or impliedly made in the sale of goods outside this Commonwealth when the seller knew such person would use, consume, or be affected by, the goods in this Commonwealth, if he also regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth[.]

Ky. Rev. Stat. § 454.210(2)(a)(2)-(5). The plaintiffs contend that their claims against each of the defendants fall into at least one of these categories. [*See* Record Nos. 30, 31, 33]

## A.    Ashimori

Ashimori is a Japanese company that manufactures seat belt and airbag component parts for motor vehicles. [Record No. 25-2, ¶¶ 4-5] The plaintiffs contend that Ashimori is subject to personal jurisdiction under subsections (a)(4) and (a)(5) of Kentucky's long arm statute, both of which require that the defendant "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth." [Record No. 31, pp. 5-7] The plaintiffs contend that this requirement is satisfied because Ashimori sells its components to MMC which, in turn, "sells a large portion of its manufactured products to MNAO." [*Id.* at 6] "Because MMC does a large portion of its business through MNAO," the plaintiffs argue that "it is reasonable to conclude Ashimori receives a significant portion of its revenue from products that are sold in Kentucky." [*Id.*]

Other than this inference, the only evidence before the Court is a declaration from Atsushi Nomura, the Manager of Ashimori's General Administration Department, which states

that "Ashimori does not solicit business, or engage in any persistent course of conduct, or derive substantial revenue from goods used or consumed or services rendered in Kentucky." [Record No. 25-2, ¶ 25] Ashimori has never transacted any business in Kentucky and "has no involvement in the sale, delivery, or issuance of warranties, on any goods in Kentucky." [*Id.* ¶¶ 21-22] The company does not directly supply goods or services in Kentucky and has "never contracted to supply services or goods in Kentucky." [*Id.* ¶¶ 26, 28]

None of Ashimori's revenue arises from the sales of vehicles in Kentucky. Further, it "has never received any payment from any public or private entity on the sale of any Ashimori component parts in Kentucky." [*Id.* ¶¶ 23-24, 40] Next, Ashimori has never been licensed to transact business in Kentucky, owned any business in Kentucky, exercised any control over any person, firm, or corporation in Kentucky, or acted as the agent or representative of any person, firm, or corporation in connection with any business transaction, production, or activity in Kentucky. [*Id.* ¶¶ 37-39, 41] In short, the company has "never directed any activity toward Kentucky." [*Id.* ¶ 34]

Construing this evidence in the light most favorable to the plaintiffs, and without weighing the defendants' controverting assertions, *Theunissen*, 935 F.2d at 1459, the evidence that Ashimori does business with MMC, which in turn does business with MNAO, which in turn does business in Kentucky, is insufficient to demonstrate that Ashimori or its agent "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth." Ky. Rev. Stat. § 454.210(2)(a)(4)-(5). As a result, the plaintiffs have failed to make a *prima facie* showing that their claims against Ashimori "arise from" any conduct or activity that fits into one of the Kentucky long arm statute's enumerated categories, and this

Court may not exercise personal jurisdiction over this defendant. *See Caesars Riverboat Casino*, 336 S.W.3d at 57.

**B.    MMC**

The plaintiffs argue that the Court has personal jurisdiction over MMC based, in large part, on "actions done by MNAO as its agent." [Record No. 30, p. 6] "'Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" *Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 50 (Ky. 2003) (quoting *CSX Transp., Inc. v. First National Bank of Grayson*, 14 S.W.3d 563, 566 (Ky. App. 1999)). "Under Kentucky law, the right to control is considered the most critical element in determining whether an agency relationship exists." *Id.* (quotations omitted).[2]

Although "a corporation can be an agent for another corporation . . . [t]his does not mean that every subsidiary is the agent of its parent; so to declare would be to destroy the privilege of limited liability obtained by satisfying the incorporation law which permits the subsidiary to be organized." Restatement (Second) of Agency § 14M (1958). Instead, "[c]orporate entities are considered separately for purposes of the personal-jurisdiction analysis; 'a company does not purposefully avail itself of the privilege of doing business in the forum state merely by owning a corporation subject to jurisdiction.'" *In re Darvocet, Darvon*

---

[2] An ostensible agency relationship can also arise when a principal "represents that another is his servant or other agent *and thereby causes a third person justifiably to rely* upon the care or skill of such apparent agent[.]" *Roethke v. Sanger*, 68 S.W.3d 352, 363 (Ky. 2001) (emphasis in original). However, the ostensible agency test is inapplicable here, because the plaintiffs have not alleged that any representation of MMC caused them to justifiably rely upon the care or skill of MNAO.

*& Propoxyphene Products Liab. Litig.*, No. 2:11-MD-2226, 2012 WL 1345175, at *3 (E.D. Ky. Apr. 18, 2012) (quoting *Niemi v. NHK Spring Co.*, 543 F.3d 294, 308 (6th Cir. 2008)).

However, "a non-resident parent corporation is amenable to suit in the forum state if the parent company exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction." *Estate of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008) (quotations omitted). To overcome the "presumption of corporate separateness" between a parent and its subsidiary, the plaintiff must present clear evidence, "beyond the subsidiary's mere presence within the bosom of the corporate family," "that the parent exerts such control over the subsidiary as to make the latter its agent or alter ego." *In re Darvocet*, 2012 WL 1345175, at *3 (quotations omitted). "The crux of the alter-ego theory of personal jurisdiction therefore is that courts are to look for two entities acting as one." *Anwar v. Dow Chemical Co.*, 876 F.3d 841, 848 (6th Cir. 2017).

Where, as here, the plaintiffs' claims are based on state law, the determination of whether the plaintiffs have made "a *prima facie* case for piercing the corporate veil" is based on state law. *Anwar*, 876 F.3d at 851 (italics added). Kentucky courts consider the following factors in determining whether to pierce the corporate veil:

a)      Does the parent own all or most of stock of the subsidiary?

b)      Do the parent and subsidiary corporations have common directors or officers?

c)      Does the parent corporation finance the subsidiary?

d)      Did the parent corporation subscribe to all of the capital stock of the subsidiary or otherwise cause its incorporation?

e)      Does the subsidiary have grossly inadequate capital?

f)       Does the parent pay the salaries and other expenses or losses of the subsidiary?

g)       Does the subsidiary do no business except with the parent or does the subsidiary have no assets except those conveyed to it by the parent?

h)       Is the subsidiary described by the parent (in papers or statements) as a department or division of the parent or is the business or financial responsibility of the subsidiary referred to as the parent corporation's own?

i)       Does the parent use the property of the subsidiary as its own?

j)       Do the directors or executives fail to act independently in the interest of the subsidiary, and do they instead take orders from the parent, and act in the parent's interest?

k)       Are the formal legal requirements of the subsidiary not observed?

*Inter-Tel Techs., Inc. v. Linn Station Props., LLC*, 360 S.W.3d 153, 163-64 (Ky. 2012).

"[C]ourts give the most emphasis to grossly inadequate capitalization, egregious failure to observe legal formalities and disregard of distinctions between parent and subsidiary, and a high degree of control by the parent over the subsidiary's operations and decisions, particularly those of a day-to-day nature," because these factors have the most bearing on "the loss of separate entity existence." *Id.* at 164 (quotations and citations omitted).

###       1.       MNAO's Actions

The plaintiffs have failed to state a *prima facie* case to pierce the corporate veil and subject MMC to this Court's jurisdiction based on MNAO's conduct. A declaration from Osamu Yamashina, Staff Manager of MMC's Office of General & Legal Affairs, indicates that MMC and MNAO are separate legal entities. MMC is a Japanese company that designs, tests, and manufactures vehicles. [Record No. 26-2, ¶¶ 37, 39] MNAO is a California company that imports and distributes vehicles in the United States. [*Id.*] MMC and MNAO have separate offices, debt structures, and bank accounts and assets. [*Id.* ¶¶ 32-34] They also

have separate employees, payrolls, and benefits plans. [*Id.* ¶¶ 30, 36] Although MNAO has an agent for service of process in Kentucky, MMC does not. [*Id.* ¶ 38]

With respect to the factors that courts emphasize most, MMC and MNAO each pay their own debts and expenses. [*Id.* ¶ 35] They are each insured and adequately capitalized. [*Id.* ¶ 40] Their corporate formalities are respected. [*Id.* ¶ 31] And MMC officers are responsible for the day to day activities of MMC, while MNAO officers and executives are responsible for the day to day activities of MNAO. [*Id.* ¶¶ 28-29]

The plaintiffs nonetheless contend that MNAO is the alter ego of MMC based on the following factors: (i) MMC owns 100% of MNAO and began streamlining its North America operations through MNAO in 1997; (ii) MMC's Executive Vice-President, Akira Marumoto, is also on MNAO's Board of Directors;[3] (iii) MMC maintains reserves for the losses of its subsidiaries and affiliates; (iv) MMC and MNAO performed a lease agreement in 2010 under which payments were made through MMC; (v) the success of MNAO and MMC are directly related; (vi) MNAO performs a substantial amount of business with MMC, amounting to approximately 39% of MMC's total exports; (vii) MNAO refers to itself, its subsidiaries, and its affiliates collectively as the "Mazda Group;" (viii) MNAO is part of MMC's global research and development network and its regional research and development headquarters; (ix) MNAO is subject to corporate policies established by MMC, such as the Mazda Corporate Code of Conduct, Financial Control Guideline, and systems for intellectual property protection; (x)

---

[3] The plaintiffs infer from the fact that Marumoto serves both of these roles that he "must act on behalf or in the interest of parent MMC" and "exercises the will of MMC over MNAO." [Record No. 30, p. 24] Although the Court accepts the plaintiffs' representation that Marumoto serves both of these roles as true, it will disregard the conclusory inferences the plaintiffs attempt to draw from this fact. *See Weller*, 504 F.2d at 931 (finding that conclusory allegations unsupported by an affidavit were insufficient to establish personal jurisdiction).

MNAO is subject to internal controls such as internal auditing, IT system auditing, security management, and a global hotline used to report compliance issues; (xi) Mazda Group files a consolidated tax return and prepares consolidated statements in accordance with MMC's corporate governance and reporting procedures; and (xii) MMC advertises through MNAO by use of its corporate brand symbol, mark, and slogan.

Again, construing this evidence in the light most favorable to the plaintiffs and without weighing the defendants' controverting assertions, *Theunissen*, 935 F.2d at 1459, this evidence is insufficient to make a *prima facie* showing that MNAO "exerts so much control over [MMC] that the two do not exist as separate entities but are one and the same for purposes of jurisdiction." *Toyota Motor Corp. Worldwide*, 545 F.3d at 362. The Court finds two cases particularly instructive in reaching this conclusion.

First, in *Toyota Motor Corp. Worldwide*, the Sixth Circuit rejected the plaintiffs' attempt to "intentionally blur[] the line between two separate and independent corporations: TMC, the maker of the [vehicle], incorporated in Japan, and Toyota Motor Sales, Inc., a separate and independent company incorporated in California that imports vehicles into the U.S., including Ohio." *Id.* at 361-62. The court found that Toyota Motor Sales, Inc. was not the alter ego of TMC under Ohio law, explaining that:

> TMC and TMS are separate legal entities. They have separate books, financial records, bank accounts, and file their own taxes. They have separate boards of directors and workforces. TMS employees report to TMS, not TMC. TMS, not TMC, controls the distribution of vehicles into the United States, including Ohio. TMS officers manage the day-to-day operations of TMS. TMC does not directly own any TMS stock nor does it have authority over TMS with regard to the distribution of vehicles. While plaintiffs say that TMC makes money from Ohio, they cite no evidence in support. Indeed, plaintiffs refer to the affidavits submitted by TMC which, as stated above, prove that TMC and TMS are separate. There is no statement in either affidavit indicating that TMC makes money from Ohio. In short, TMS is not an alter ego of TMC.

*Id.* at 363.

Next, the United States District Court for the Southern District of Alabama has applied the same eleven-factor test used by Kentucky courts to MNAO and MMC, and found that MNAO is not the alter ego of MMC. *Foster v. Bridgestone Americas, Inc.*, 11-175, 2011 WL 3606983, at *3, 5-6 (S.D. Ala. Aug. 15, 2011). There, the plaintiffs relied on much of the same evidence that the plaintiffs provide here, including that: MMC owns 100% of MNAO and began streamlining its North American operations through MNAO in 1997; MNAO previously made payments on a lease obligation through MMC; MNAO is one of MMC's research and development sites; MMC incorporates data from MNAO and other subsidiaries into its financial statements; MMC and MNAO use certain control rules and procedures to manage credit risks, and have jointly adopted certain accounting principles; MMC works closely with MNAO on auditing issues; and MNAO is subject to certain corporate policies regarding corporate ethics, risk management, corporate values, evaluation of productivity and market performance, and information security. *Id.* at *3-4.

Summarizing this evidence, the court found that "there is no doubt that Mazda Japan and Mazda America are linked, and their businesses interwoven, in certain respects. This is hardly revelatory, and would logically be expected in any parent/wholly-owned subsidiary relationship."[4] *Id.* at *5. But there was no evidence of "ironclad control over the subsidiary's day-to-day operations," such as MMC dictating to MNAO "how many dealerships to operate, where to locate them, how many employees to hire, how many vehicles to order and at what price to sell them, and so forth." *Id.* As a result, the court concluded that:

---

[4] The court in *Foster* refers to MMC as "Mazda Japan" and MNAO as "Mazda America."

Rather than casting Mazda America as a mindless puppet whose strings are pulled by a domineering Mazda Japan puppeteer, [this] evidence reveals a wholly-owned subsidiary that receives guidance from, and works closely with, the parent corporation. Mazda Japan oversees Mazda America's activities, inspects its operations, collaborates with Mazda America on quality management and training, assists Mazda America's efforts to implement intellectual property policies, provides operational support to Mazda America, issues directives on things like accounting principles and auditing, and promotes human resource training that follows an organizational philosophy espousing such concepts as "integrity" and "self initiative." But those facts in no way evince the kind of tightfisted, nuts-and-bolts, day-in-day-out control necessary to show Mazda America as a mere instrumentality or dummy.

*Id.* at \*6. In short, "the evidence here strongly suggests a run-of-the-mill parent/subsidiary relationship between the two companies[.]" *Id.*

As in *Foster*, the plaintiffs in this case have failed to provide evidence, "beyond the subsidiary's mere presence within the bosom of the corporate family," *In re Darvocet*, 2012 WL 1345175, at \*3 (quotations omitted), showing that MMC "exerts so much control" over MNAO "that the two do not exist as separate entities but are one and the same for purposes of jurisdiction." *Toyota Motor Corp. Worldwide*, 545 F.3d at 362. As a result, they cannot rely on MNAO's conduct to establish that MMC is subject to personal jurisdiction in this Court.

### 2. MMC's Actions

The plaintiffs contend that MMC is subject to personal jurisdiction under subsections (a)(2) through (a)(5) of the Kentucky long arm statute. [Record No. 30, pp. 5-10] They argue that these subsections are satisfied because: (i) there are 630 Mazda dealerships in the United States, including six fleet dealerships in Kentucky; (ii) MMC advertises through MNAO, in Kentucky and elsewhere, by use of its corporate brand symbol, mark, and slogan; (iii) MMC's consolidated corporate structure allows for it to derive revenue from its sales to MNAO; (iv)

MMC markets its safety ratings individually and through MNAO; and (v) the United States is MMC's top market. [*Id.*]

None of these allegations are sufficient to state a *prima facie* case that MMC's conduct, considered apart from MNAO's conduct, falls within any of the subsections enumerated in Kentucky's long arm statute. The Yamashina declaration states "MMC has no involvement in the sale or delivery of any goods in Kentucky." [Record No. 26-2, ¶ 12, 15] MMC does not advertise in Kentucky, transacts no business in Kentucky, and derives no revenue from the sale of vehicles in Kentucky. [*Id.* ¶¶ 11-13] "MMC never caused any tortious injury, by acting or failing to act, which occurred in Kentucky." [*Id.* ¶ 25] "None of MMC's revenue arises from the sale of vehicles in Kentucky," and "MMC does not solicit business, or engage in any other persistent course of conduct, or derive substantial revenue from goods used or consumed or services rendered in Kentucky." [*Id.* ¶¶ 13-14] MMC has no facilities, employees, or representatives in Kentucky, does not own any business in Kentucky, and exercises no control over any person, firm, or corporation in Kentucky. [*Id.* ¶¶ 16-18, 21-23]

The plaintiffs have not provided any evidence that MMC, as opposed to MNAO, has contracted to supply services or good in Kentucky, caused tortious injury by any act or omission in Kentucky, or regularly done or solicited business, or engaged in any other persistent course of conduct, or derived substantial revenue from goods used or consumed or services rendered in Kentucky. Ky. Rev. Stat. § 454.210(2)(a)(2)-(5). As a result, the plaintiffs have failed to make a *prima facie* showing that their claims against MMC "arise from" any conduct or activity that fits into one of the Kentucky long arm statute's enumerated categories, and this Court may not exercise personal jurisdiction over MMC. *See Caesars Riverboat Casino*, 336 S.W.3d at 57.

## C.    DC and DSS

The plaintiffs contend that personal jurisdiction "under the [Kentucky] long-arm [statute] may be had by DC or DSS's direct actions or by actions done by DSSA as its agent." [Record No. 33, p. 6]  But as explained above, this is only true if the plaintiffs have stated a *prima facie* case to pierce the corporate veil under the eleven factor test employed by Kentucky courts.  *See Inter-Tel Techs.*, 360 S.W.3d at 163-64.  Here, they have not.

### 1.    DSSA's Actions

Affidavits from Yosuke Omae, DSS' President, Ichiro Hayashi, DC's General Manager of Administration and Legal Services, Corporate Support Center, and Wayne Thomas, DSSA's Company President, indicate that DSSA, DC, and DSS, are separate legal entities.  [Record Nos. 27-2, 27-3, and 27-4]  DC is a Japanese company that designs airbag components. [Record No. 27-3, ¶¶ 3, 48, 50]  DC wholly owns a subsidiary named Daciel America Holdings, Inc., which in turn is the parent company of DSSA, a Kentucky company that manufactures certain airbag components and distributes them in the United States.  [*Id.* ¶¶ 35, 48, 50]  DC and DSSA are two steps removed from each other and have separate officers and boards of directors.  [*Id.* ¶ 36-37]  They have separate bank accounts and assets, separate offices, separate employees, and separate payrolls and benefits plans.  [*Id.* ¶ 39, 41, 42, 46, 47]

With respect to the factors that courts emphasize most, DC and DSSA have separate debt structures and pay their own debts and expenses.  [*Id.* ¶ 43-45]  They are each solvent, insured, and adequately capitalized.  [*Id.* ¶ 51-52]  Their corporate formalities are respected. [*Id.* ¶ 40]  And DC officers and executives are responsible for the day to day activities of DC, while DSSA officers and executives are responsible for the day to day activities of DSSA.  [*Id.*

- 15 -

¶ 38] DSS is a Japanese corporation with its principal place of business in Japan. [Record No. 27-2, ¶ 3] There is no evidence in the record regarding DSS' relationship to DC or DSSA.

The plaintiffs nonetheless assert that DSSA is the alter ego of DC and DSS based on the following factors: (i) DC wholly owns Daciel America Holdings, Inc., which is the parent company of DSSA; (ii) Yasuhiro Sakaki and Satoshi Sakamoto are listed as directors, officers, or managers of both DC and DSSA;[5] (iii) DSSA's success is directly related to the success of DC and DSS; (iv) DC commonly refers to itself and its subsidiaries as "Daciel Group," a shared corporate brand; (v) Daciel Group has a consolidated research and development site in Japan; (vi) DSSA and DSS belong to business divisions within DC which receive more or less resources depending on growth rates; (vii) the defendants' affidavits do not state that DC and DSS do not use DSSA's property; (viii) Daciel Group files a consolidated tax return and prepares consolidated statements in accordance with the Daciel Group's corporate governance and reporting procedures. [Record No. 33, pp. 21-28]

The plaintiffs have provided evidence that several of the factors Kentucky courts consider, such as common directors or officers, financing the subsidiary, describing the subsidiary as a subdivision, and possibly using the subsidiary's property, have been met. However, the plaintiffs have failed to provide any evidence showing that the most crucial factors—inadequate capitalization, egregious failure to observe legal formalities, and a high degree of control by the parent over the subsidiary's operations and decisions, particularly

---

[5] Again, plaintiffs infer from the fact that Sakaki and Sakamoto serve both of these roles that they act in the interest of the parent corporation and exercise its will over the subsidiary. [Record No. 333, pp. 22-23, 25-26] But again, the Court will disregard the conclusory inference the plaintiffs attempt to draw from the fact that these officers and directors serve roles in multiple entities. *See Weller*, 504 F.2d at 931 (finding that conclusory allegations unsupported by an affidavit were insufficient to establish personal jurisdiction).

those of a day-to-day nature—have been satisfied. Instead, the only evidence regarding these factors indicates that DC and DSSA are each insured, solvent, and adequately capitalized. [Record No. 27-3, ¶¶ 51-52] They are two steps removed from each other and have separate boards of directors. [*Id.* ¶ 36] Corporate formalities are respected. [*Id.* ¶ 40] And DC officers and executives are responsible for the day to day activities of DC, while DSSA officers and executives are responsible for the day to day activities of DSSA. [*Id.* ¶¶ 38]

Construing this evidence in the light most favorable to the plaintiffs, and without weighing the defendants' controverting assertions, *Theunissen*, 935 F.2d at 1459, the plaintiffs' allegations are insufficient to make a *prima facie* showing that DC and DSS "exert[] so much control over [DSSA] that [they] do not exist as separate entities but are one and the same for purposes of jurisdiction." *Toyota Motor Corp. Worldwide*, 545 F.3d at 362. In reaching this conclusion, the Sixth Circuit's decision in *Anwar* is instructive. 876 F.3d at 847-51.

In *Anwar*, as here, the plaintiff sought to assert personal jurisdiction over a defendant based on a legal entity that was several steps removed from it. 876 F.3d at 847-48. And as here, the plaintiff produced some evidence regarding shared board membership between the corporations, a common source of financing shared among the sister and affiliated companies, a common website, and a common enterprise. *Id.* at 849-50. The Sixth Circuit found that, although these facts "partially satisfy a few different factors" relevant to piercing the corporate veil under federal common law and Michigan law, the plaintiff did not allege "that there are shared employees (only managers with shared roles), that the same address and phone lines are used, that the two entities complete the same jobs, or that they maintain books, tax returns, and financial statements across the two entities." *Id.* at 850. Further, the plaintiff did not allege

that one entity controlled the daily affairs of the other. *Id.* As a result, the Court concluded that the plaintiff's alleged facts did not amount to a showing that the alleged parent corporation controlled the other entity to such a degree as become its alter ego. *Id.*

Similarly, the plaintiffs' allegations in this case that entities with the Daciel Group share a corporate brand, research and development resources, two officers and directors, and are generally a part of a common enterprise, are insufficient to demonstrate that DC and DSS "exert[] so much control" over DSSA "that [they] do not exist as separate entities but are one and the same for purposes of jurisdiction." *Toyota Motor Corp. Worldwide*, 545 F.3d at 362. As a result, the plaintiffs cannot rely on DSSA's actions to establish that DC and DSS are subject to personal jurisdiction in this Court.[6]

### 2. DC and DSS' Actions

The plaintiffs contend that DC and DSS are subject to personal jurisdiction under subsections (a)(2) through (a)(5) of the Kentucky long arm statute. They allege that these subsections are met because: (i) DC sells its components to third parties knowing they will be included in automobiles, thus "impliedly contract[ing] to design, manufacture, and supply these goods to Kentucky through a collaborative effort to produce vehicles for the American market;" (ii) DC derives revenue from the sale of airbag components which it knew to be used in vehicles bound for the United States; and (iii) DSS derives revenue from its sales to DC,

---

[6] "Nor is the Court persuaded by the plaintiffs' insistence that jurisdictional discovery is needed, since the lenient prima facie standard is premised on the assumption that plaintiffs will not have had the benefit of such discovery." *In re Darvocet*, 2012 WL 1345175, at *4.

which DSS knew would result in sales to third parties, which would use its components in vehicles bound for the United States and Kentucky.[7]  [Record No. 33, pp. 6-11]

None of these allegations are sufficient to state a *prima facie* case that DC and DSS' conduct, considered apart from DSSA's conduct, falls within any of the subsections enumerated in Kentucky's long arm statute.  The fact that DSS sold its airbag inflators to DC, which in turn sold them to Ashimori, which in turn sold them to MMC, which in turn sold them to MNAO, which in turn sold them to dealerships in the United States, does not demonstrate that DC and DSS "impliedly contracted to design, manufacture, and supply these goods to Kentucky[.]"  [*Id.* at 8]  DSS manufactured the subject airbag inflators in Hyogo, Japan and sold them to DC in Japan, which in turn sold them to Ashimori in Japan.  [Record No. 27-2, ¶¶ 6, 7]  There is no evidence that DC or DSSA performed any act or omission outside of Japan that caused tortious injury.  Ky. Rev. Stat. § 454.210(2)(a)(3).  Nor is there any evidence that DC or DSS "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth."  Ky. Rev. Stat. § 454.210(2)(a)(4)-(5).

The only evidence before the Court indicates that DC has never supplied goods or services in Kentucky, transacted business in Kentucky, advertised in Kentucky, or designed, tested, or manufactured airbag inflators in Kentucky.  [Record No. 27-3, ¶¶ 10-21]  Similarly, DSS has never conducted any business in Kentucky, designed, tested, or manufactured airbag inflators in Kentucky, or "solicited business, or engaged in any other persistent course of

---

[7] The plaintiffs' remaining allegations rely on DSSA to establish that this Court has jurisdiction over DC and DSS.  For the reasons stated in the previous section, the Court will disregard these allegations in assessing DC and DSS' connection to this forum.

conduct, or derived substantial revenue from goods used or consumed or services rendered in Kentucky." [Record No. 27-2, ¶¶ 10-12, 20]

The plaintiffs have not provided any evidence that DC or DSS, as opposed to DSSA, have contracted to supply services or good in Kentucky, caused tortious injury by any act or omission in Kentucky, or regularly done or solicited business, or engaged in any other persistent course of conduct, or derived substantial revenue from goods used or consumed or services rendered in Kentucky. Ky. Rev. Stat. § 454.210(2)(a)(2)-(5). As a result, they have failed to make a *prima facie* showing that their claims against DC and DSS "arise from" any conduct or activity that fits into one of the Kentucky long arm statute's enumerated categories the plaintiffs, and this Court may not exercise personal jurisdiction over DC or DSS. *See Caesars Riverboat Casino*, 336 S.W.3d at 57.

## IV.

Although the plaintiffs are only required to make a *prima facie* showing that personal jurisdiction exists in this Court, they may not stand on their pleadings, but must "set forth specific facts showing that the court has jurisdiction." *Theunissen*, 935 F.2d at 1458. They have failed to carry this burden by setting forth specific facts showing that their claims against Ashimori, MMC, DC, and DSS "arise from" conduct that fits into one of the Kentucky long arm statute's enumerated categories. *See Caesars Riverboat Casino*, 336 S.W.3d at 57. Further, they have failed to allege sufficient facts to pierce the corporate veil, so that they might rely on the conduct of MNAO and DSSA to, in part, cure this deficiency. Accordingly, it is hereby

**ORDERED** as follows:

1.      The defendants' motions to dismiss for lack of personal jurisdiction [Record Nos. 25, 26, 27] are **GRANTED**.

2.      Defendants Ashimori Industry Company, Ltd., Mazda Motor Corp., Daciel Corporation, are Daciel Safety Systems, Inc., are **DISMISSED** as parties to this action. Because, however, dismissal is based on a lack of personal jurisdiction over these parties, the dismissal is without prejudice to the claims being asserted in a court having jurisdiction over the dismissed defendants.

This 30th day of March, 2018.

Signed By:

*Danny C. Reeves*  DCR

United States District Judge